Filed 8/25/25  P. v. Kalantaryan CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>ROMA KALANTARYAN,<br><br>        Defendant and Appellant. | B337562<br><br>(Los Angeles County<br> Super. Ct. No. KA091061) |

APPEAL from an order of the Superior Court of Los Angeles County, Juan Carlos Dominguez, Judge.  Affirmed.

Sabrina R. Damast and Alan Fenster for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews, Chung L. Mar, and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

In 2000, 19-year-old Roma Kalantaryan immigrated to the United States from Armenia. Soon after arriving, he repeatedly found himself on the wrong side of the law. In 2004, in two separate cases, he pleaded nolo contendere to soliciting a lewd act and to assault with a deadly weapon or by force likely to produce great bodily injury. Immigration authorities sought to remove him after these two convictions but terminated the proceedings without prejudice in order to first address his asylum status. In 2005, Kalantaryan pleaded nolo contendere to a misdemeanor. In 2007, he pleaded nolo contendere to two counts of burglary. In 2010, facing 16 new felony charges, he pleaded nolo contendere to theft and possession of a firearm by a felon. In 2012, immigration authorities ordered him removed from the United States. Armenia would not accept him, and he remained here.

In 2023, Kalantaryan sought to vacate his 2010 convictions pursuant to Penal Code[1] section 1473.7, subdivision (a)(1), which permits a court to vacate a conviction that is "legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction." (*Ibid*.) Kalantaryan asserted his criminal defense counsel failed to explain to him the immigration consequences of his 2010 plea and that he "didn't really understand much of what was going on" during the plea hearing. The trial court denied the motion, finding after an evidentiary hearing that Kalantaryan's testimony lacked credibility.

---

[1] Further statutory references are to the Penal Code unless otherwise specified.

Kalantaryan now appeals. He argues the trial court's adverse credibility determination was erroneous, that the record demonstrates he did not meaningfully understand the immigration consequences of his 2010 plea, and that he was prejudiced thereby. Kalantaryan also claims the court directed comments to his counsel during the evidentiary hearing that violated the California Racial Justice Act of 2020 (RJA; Stats. 2020, ch. 317, § 1).

We conclude Kalantaryan has not demonstrated that he did not meaningfully understand the consequences of his 2010 plea. Nor has he established a violation of the RJA. We thus affirm.

## BACKGROUND

### A. Factual Background

Kalantaryan was born in Armenia in 1981, when it was part of the Soviet Union. In 2000, he and his parents moved to the United States. His father was granted asylum, and the record suggests Kalantaryan became a lawful permanent resident in 2006. That same year, Kalantaryan married an American citizen, Arpine Esmailian. In 2014, Esmailian passed the California bar examination. The couple have three children, whose ages in December 2023 were 16, 14, and seven.

### B. Criminal and Immigration History

#### 1. *April and July 2004 Convictions*

In April 2004, Kalantaryan pleaded no contest to misdemeanor disorderly conduct, soliciting a lewd act. (§ 647, subd. (a).) (Case No. 4HL00107.) Separately, in July 2004, he pleaded nolo contendere to assault with a deadly weapon or by force likely to produce great bodily injury (§ 245, subd. (a)(1)). (Case No. GA054444.) The court's minutes in each case indicate

3

Kalantaryan was represented by counsel, assisted by an Armenian language interpreter, and that the court advised him that if he was not a citizen, "a conviction of the offense for which [he had] been charged will have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States."

### 2. *2004 Removal Proceedings*

In December 2004, federal immigration authorities notified Kalantaryan that because he was convicted of two crimes involving moral turpitude not arising out of a single scheme of criminal conduct, he was subject to removal.

During removal proceedings, the immigration judge noted that an interpreter was not needed and that "[Kalantaryan] speaks English." The judge also asked Kalantaryan, "What language do you want to have your hearing in?" Kalantaryan's counsel, Elsa Martinez, replied, "English." After a discussion off the record, unidentified counsel moved to terminate the proceedings based on the nature of the offenses. The same counsel also explained that Kalantaryan's derivative asylee status had to be terminated before the immigration court could exercise jurisdiction over him. Martinez did not oppose terminating the proceedings and stated Kalantaryan understood that he "may be subject to notice of termination of his asylum status which may come from the district later." The court then terminated the removal proceeding without prejudice.

### 3. *2005 Misdemeanor Conviction*

In 2005, Kalantaryan pleaded no contest to a misdemeanor charge of causing a loud noise (§ 415, subd. (2)). (Case No. 5GL04065.) The court's minutes do not indicate the court provided an immigration consequences advisement.

4

### 4. *2007 Burglary Conviction*

In September 2007, Kalantaryan pleaded nolo contendere to two counts of burglary (§ 459). (Case No. KA079696.) He was represented by private counsel, and the court advised him of the immigration consequences of his plea.

The record does not include an advisement of rights, waiver, and plea form (i.e., a *Tahl*[2] waiver) for any of the four above-described pleas.

### C. **The Plea at Issue**

In June 2009, video surveillance captured Kalantaryan making purchases with an ATM card that was not his own. Police obtained a search warrant for his residence. Inside they found the clothing Kalantaryan was wearing on the video, nearly $38,000 in cash, and evidence Kalantaryan had a storage facility. After obtaining an extension of the search warrant for the storage facility, police found inside it three firearms, approximately 300 credit cards, a credit card scanning device, papers with handwritten personal data for other people, blank counterfeit credit cards, and numerous blank checks. Of the 300 credit cards, 21 of the actual cardholders had experienced fraudulent charges totaling almost $100,000. Shortly thereafter, the People charged Kalantaryan with 17 counts (16 felony counts and one misdemeanor), including credit card information theft (§ 484e, subd. (b); count 7) and possession of a firearm by a felon with two priors (former § 12021, subd. (a)(1); count 8). (Case No. KA091061.)

---

[2] *In re Tahl* (1969) 1 Cal.3d 122.

On September 27, 2010, Kalantaryan initialed, signed, and dated a *Tahl* waiver form. He initialed next to several advisements, including: "12. **Immigration Consequences** – I understand that if I am not a citizen of the United States, I must expect my plea of guilty or no contest will result in my deportation, exclusion from admission or reentry to the United States, and denial of naturalization and amnesty." He also initialed next to an acknowledgement that "[p]rior to entering this plea, I have had a full opportunity to discuss with my attorney the facts of my case, the elements of the charged offense(s) and enhancement(s), and defenses that I may have, my constitutional rights and waiver of those rights, and the consequences of my plea." Kalantaryan signed below an acknowledgement stating, "I have read and initialed each of the paragraphs above and discussed them with my attorney. My initials mean that I have read, understand and agree with what is stated in the paragraph. The nature of the charges and possible defenses to them, and the effect of any special allegations and enhancements have been explained to me. I understand each and every one of the rights outlined above and I hereby waive and give up each of them in order to enter my plea to the above charges."

Kalantaryan's defense counsel, Garo Ghazarian, also signed the *Tahl* waiver, attesting, "I have reviewed this form with my client. I have explained each of the defendant's rights to the defendant and answered all of his or her questions with regard to those rights and this plea. I have also discussed the facts of the case with the defendant, and explained the nature and elements of each charge, any possible defenses to the

charges, the effect of any special allegations and enhancements, and the consequences of the plea."

The *Tahl* waiver included a standard provision to be filled out by an interpreter if one was used; that portion is blank.

During the oral plea colloquy, the court asked Kalantaryan about the *Tahl* waiver and again advised him of the immigration consequences of his plea. The court stated, "I have a document entitled felony advisement of rights, waiver, and plea form. Did you read and understand this form?" Kalantaryan responded, "Yes, sir." The court then asked, "Did you go over it thoroughly with your lawyer?" Kalantaryan responded, "Yes, sir." The court also inquired, "Do you understand that if you are not a citizen of the United States a plea of no contest to these charges will result in your deportation, exclusion from admission or reentry to the United States, and denial of naturalization and amnesty?" Again, Kalantaryan responded, "Yes, sir." The court asked whether Kalantaryan had any questions. Kalantaryan stated, "No, sir." Kalantaryan then confirmed that he had initialed and signed the form.

The prosecutor asked Kalantaryan whether he was comfortable with the English language, whether he understood he had the right to an interpreter who could explain the plea agreement to him, and whether he was comfortable proceeding without an interpreter. Kalantaryan replied, "Yes, sir" to each question. Kalantaryan also stated that he understood that the theft charge was a crime of moral turpitude.

Kalantaryan pleaded no contest to counts seven and eight. The court accepted his plea and sentenced him to three years in state prison for count seven and a concurrent term of 16 months for count eight.

7

**D. Subsequent Removal Proceedings**

In December 2011 or January 2012, the U.S. Department of Homeland Security (DHS) ordered Kalantaryan to appear at a removal hearing. DHS alleged that Kalantaryan was subject to removal because he was (1) convicted of two crimes of moral turpitude, not arising out of a single scheme of misconduct, (2) convicted of an aggravated felony, and (3) convicted of an aggravated felony that was a theft or burglary offense for which the term of imprisonment was at least one year. In particular, the charging document identified Kalantaryan's July 2004 conviction for assault with a deadly weapon and his September 2010 convictions for theft and felon in possession of a firearm.

On February 6, 2012, the immigration judge found Kalantaryan was subject to removal based on the first two grounds. The judge observed that Kalantaryan made no application for relief and was "[i]neligible for any relief" due to the firearm aggravated felony. Accordingly, the judge ordered Kalantaryan removed to Armenia. Next to "Appeal," the immigration judge circled "waived."[3] (Capitalization omitted.)

DHS was unable to deport Kalantaryan. According to Kalantaryan, this was because he was born in the former Soviet Union and was never an Armenian citizen.

---

[3] An attorney from Martinez's office represented Kalantaryan at the 2012 removal proceedings. On October 7, 2024, after the denial of the motion to vacate at issue in this appeal, Kalantaryan sought to appeal the removal order to the Board of Immigration Appeals (BIA).

8

**E.     Section 1473.7 Motion to Vacate the 2010 Convictions**

1.     *Kalantaryan's Motion and Evidence*

On February 2, 2024, Kalantaryan filed a section 1473.7 motion to vacate his 2010 convictions.[4]  He argued that he did not understand the immigration consequences of his 2010 plea and would not have entered into the plea if he had understood that it would cause him to be deported.  In support of the motion, Kalantaryan declared that at the time of his plea, his attorney advised him that he would face a long sentence if convicted of all charges.  His attorney negotiated a plea for a three-year prison term, and "not knowing what else to do, [Kalantaryan] agreed to the deal despite the fact that [he] was innocent."

Kalantaryan also declared that when he initialed and signed the *Tahl* waiver, he "did not read English very well," "but [his] lawyer just told [him] to fill out the form so [he] could take the deal . . . .  [The lawyer] never said one word to [him] about any immigration consequences that [Kalantaryan] would suffer from pleading guilty."  Although the court advised Kalantaryan of "certain constitutional rights," he "[is] not sure what the judge said about the immigration consequences of [his] guilty plea but the fact is that [he] had no idea that [his] guilty plea . . . required that [he] be ordered deported.  [He] had only been in [the United States for] 10 years when [he] went to court and [he] was very

_____

[4] On December 26, 2023, Kalantaryan filed a motion to vacate his plea pursuant to section 1016.5, which requires the trial court to give a specific admonition before accepting a plea of guilty or nolo contendere to any offense other than an infraction. The court observed the petition was more properly a motion to vacate under section 1473.7, and Kalantaryan therefore filed the motion at issue in this appeal.

9

nervous and did[ not] really understand much of what was going on. [¶] If [he] had known that [he] was definitely going to be deported as a result of pleading guilty to the charged crimes, [he] never would have pled guilty. [He] was innocent and [he] would have taken [his] chances at trial. [He] had two young children at the time and a wonderful wife and being deported would have . . . totally destroyed [his] life. [¶] [He] spent a year and one half in prison, then [five] months in immigration custody while fighting deportation. After two months [he] was ordered deported . . . and then was kept in [DHS] custody three more months while they worked on deporting [him]. Eventually [he] was released because there were problems sending [him] back to Armenia. Every year [since then, he] report[s] to [DHS] while they . . . try[] to work out deportation agreements with Armenia. [He has] been reporting [for] 11 years to [DHS] and [he is] afraid one of these years they will send [him] back to Armenia and [he] will lose everything."

Kalantaryan's declaration made no mention of his 2004 convictions for assault with a deadly weapon and soliciting a lewd conduct, nor did it mention that he underwent deportation proceedings in December 2004 as a result of those convictions.

The motion also included a December 2023 declaration from attorney Ghazarian stating he could not locate Kalantaryan's file. Ghazarian said his current practice is to obtain advice from immigration counsel when advising clients about the consequences of their pleas. However, he disclaimed any memory of his practice at the time he represented Kalantaryan and he "ha[s] no recollection as to whether [he] discussed the immigration consequences with . . . Kalantaryan."

### 2. *January 2024 Evidentiary Hearing*

The court held an initial hearing on January 9, 2024. Kalantaryan was not present. The court indicated Kalantaryan's failure to mention his two prior convictions and that he had previously been in removal proceedings undermined his claimed lack of understanding about what occurred at his 2010 plea. The court also did not believe Kalantaryan's statement that Ghazarian did not advise him of the immigration consequences of his plea and observed that Kalantaryan did not appear diligent in bringing his motion to vacate until more than seven years after section 1473.7 became law. The court stated it wanted Kalantaryan to come to court where he could be cross-examined and "his credibility . . . tested."

### 3. *Kalantaryan's Testimony*

On February 29, 2024, Kalantaryan testified that he sought advice from seven or eight immigration attorneys in an effort to change the removal order. He first contacted attorney Martinez (who represented him in the 2004 immigration proceedings) "as soon as [he] was released from [DHS]" in May 2012. Each attorney indicated they could not help him because there was already a deportation order. In 2014, his wife passed the California bar examination, but she was a civil litigator and unable to help him with his immigration issues. Eventually, Kalantaryan spoke with attorney Houman Varzandeh, who told him he had a tough case. Kalantaryan's wife eventually referred him to attorney Alan Fenster. No one prior to Fenster told Kalantaryan he could file a motion to vacate the conviction.

Kalantaryan testified that when he pleaded no contest in 2010, he "had no idea" about the immigration consequences of that plea. Ghazarian only asked him whether he had a green

11

card. When Kalantaryan responded that he did, Ghazarian asked how he had obtained one. Kalantaryan responded, "because of [his parents'] asylum case." Kalantaryan testified that he received his green card after the two convictions that culminated in the 2004 removal proceedings and the immigration judge canceled his removal because of his asylee status. Upon questioning from the trial court, Kalantaryan testified his father had asylee status and Kalantaryan obtained lawful permanent resident status through his father. He claimed the immigration judge "reinstated" his status following the removal proceedings. The People asked Kalantaryan what, if anything, he believed would be the impact on his immigration status after the 2004 removal proceedings if he continued to commit felonies. He responded that he did not think about it.

The court explained that in its view Kalantaryan was "totally and completely not credible," and took the matter under submission.

We describe *post* portions of the proceedings relevant to Kalantaryan's RJA challenge.

4.     *Kalantaryan's Supplemental Evidence*

On March 6, 2024, Kalantaryan submitted declarations from attorneys Jilbert Tahmazian[5] and George Mgdesyan, and a letter from Varzandeh, in support of his motion. Tahmazian's and Mgdesyan's declarations state that between 2013 to 2016, Kalantaryan sought advice from one or the other of them on three occasions; they both told him they could not help. Varzandeh stated that in or after 2022, he advised Kalantaryan "that there

_____

[5] Tahmazian represented Kalantaryan during his July 2004 plea.

12

was caselaw that would suggest that the case would not be reopened because the decision was legally correct at the time it was rendered. Hence, . . . the only way forward was to collaterally attack the conviction through a motion to . . . vacate." (Boldface and underscoring omitted.)

Kalantaryan also provided a declaration from his wife, Esmailian. She declared, "When my husband pled guilty before the judge [in] 2010 . . . , I had . . . started my first year in law school. My husband was informed while serving time that he would be facing mandatory deportation because he was not a United States citizen." Since that time, the couple hired several attorneys to inquire about available remedies. Esmailian further declared that upon learning Kalantaryan could move to vacate his conviction, he promptly retained an attorney to do so.

5. *The Trial Court's Ruling*

On March 8, 2024, the court denied Kalantaryan's petition in a written order. The decision stated that during the January 2024 hearing, the court learned that Kalantaryan had suffered two prior convictions and had been placed in deportation proceedings. Kalantaryan's failure to mention these facts "affected his credibility." The court further observed that there were inconsistencies and other concerning issues with the declarations from Kalantaryan's wife and former attorneys. The court concluded, "Based on the totality of the numerous discrepancies in [Kalantaryan]'s assertions, the court finds that they, as a whole, lack credibility, and accordingly, the court gives little if no weight to said assertions. Since his written and oral assertions must be credible for the court to grant him the relief that he requests, his petition is denied generally on credibility grounds. . . . Specifically, [Kalantaryan]'s written declaration can

13

only be viewed as an attempt to mislead the court. Omitting from his declaration that he had suffered two felony convictions and had been in deportation proceedings, all prior to his conviction in the instant case can only be viewed as such."[6]

## DISCUSSION

**A.** **The Record Does Not Demonstrate That Kalantaryan Did Not Meaningfully Understand the Immigration Consequences of His 2010 Plea**

1. *General Legal Principles and Burden of Proof Under Section 1473.7*

The Legislature enacted section 1473.7, effective January 1, 2017 (Stats. 2016, ch. 739, § 1), to ensure noncitizen defendants "receive clear and accurate advice about the impact of criminal convictions on their immigration status, along with effective remedies when such advice is deficient." (*People v. Vivar* (2021) 11 Cal.5th 510, 516.)

"[S]ection 1473.7 allows noncitizens who have served their sentences to vacate a conviction if they can establish by a preponderance of the evidence that their conviction is 'legally invalid due to prejudicial error damaging [their] ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence.' " (*People v. Espinoza* (2023) 14 Cal.5th 311, 316.) "To prevail on a motion under section 1473.7, a

---

[6] The court was mistaken that Kalantaryan had suffered two felony convictions as of 2004; he had suffered two convictions (one a felony and one a misdemeanor), both of which were crimes of moral turpitude that subjected him to potential removal.

14

defendant must satisfy two elements. 'The defendant must first show that he did not meaningfully understand the immigration consequences of his plea. Next, the defendant must show that his misunderstanding constituted prejudicial error.' " (*People v. Curiel* (2023) 92 Cal.App.5th 1160, 1172, citing *People v. Espinoza, supra,* at p. 319.)

The focus of inquiry in a section 1473.7 motion is on the defendant's own subjective error in misunderstanding the consequences of the plea. (*People v. Curiel, supra,* 92 Cal.App.5th at p. 1176; *People v. Mejia* (2019) 36 Cal.App.5th 859, 871.) However, "[a] defendant seeking to set aside a plea must do more than simply claim he did not understand the immigration consequences of the plea." (*People v. Abdelsalam* (2022) 73 Cal.App.5th 654, 664.) Rather the defendant "must corroborate any assertions with ' " 'objective evidence.' " ' " (*People v. Espinoza, supra,* 14 Cal.5th at p. 316, citing *People v. Vivar, supra,* 11 Cal.5th at p. 530; see also *People v. Mejia, supra,* 36 Cal.App.5th at p. 872 ["In a postconviction setting, courts should not simply accept a defendant's statement of regret regarding the plea, courts should also 'look to contemporaneous evidence to substantiate a defendant's expressed preferences' "].)

"Objective evidence includes facts provided by declarations, contemporaneous documentation of the defendant's immigration concerns or interactions with counsel, and evidence of the charges the defendant faced." (*People v. Espinoza, supra,* 14 Cal.5th at p. 321.) A defendant "is not required to provide the declaration of plea counsel" or "to submit contemporaneous documentation from the time of his plea." (*Id.* at p. 325.) "Rather, the inquiry under section 1473.7 requires consideration of the 'totality of the circumstances,' which necessarily involves case-by-case

examination of the record [citation], and no specific kind of evidence is a prerequisite to relief." (*Ibid*.)

### 2. *Standard of Review*

On appeal, section 1473.7 motions are subject to independent review. (*People v. Vivar*, *supra*, 11 Cal.5th at pp. 524-528.) That means we " 'exercise[ our] independent judgment to determine whether the facts satisfy the rule of law.' " (*Id*. at p. 527.)

Independent review is not the equivalent of de novo review. (*People v. Vivar*, *supra*, 11 Cal.5th at p. 527.) "An appellate court may not simply second-guess factual findings that are based on the trial court's own observations. [Citations.] . . . [F]actual determinations that are based on ' "the credibility of witnesses the [superior court] heard and observed" ' are entitled to particular deference, even though courts reviewing such claims generally may ' "reach a different conclusion [from the trial court] on an independent examination of the evidence . . . even where the evidence is conflicting." ' [Citation.] . . . Where . . . the facts derive entirely from written declarations and other documents, however, there is no reason to conclude the trial court has the same special purchase on the question at issue; as a practical matter, '[t]he trial court and this court are in the same position in interpreting written declarations' when reviewing a cold record in a section 1473.7 proceeding." (*Id*. at pp. 527-528, fns. omitted.)

### 3. *Analysis*

Kalantaryan declared that during his 2010 plea, he "was very nervous and did[ not] really understand much of what was going on." He claimed his lawyer never advised him of the immigration consequences of his plea and that he "[is] not sure what the judge said about the immigration consequences of [his]

16

guilty plea but the fact is that [he] had no idea that [his] guilty plea . . . required that [he] be deported."

Kalantaryan does not offer objective evidence corroborating these contentions, and the objective evidence that does exist gainsays them. Although Ghazarian's declaration did not contradict Kalantaryan's claims, it did not corroborate them. Ghazarian declared that he did not recall whether he discussed immigration consequences with Kalantaryan or what his practice was "at the time" of the 2010 plea. "An allegation that trial counsel failed to properly advise a defendant is meaningless unless there is objective corroborating evidence supporting [the] claimed failures." (*People v. Cruz-Lopez* (2018) 27 Cal.App.5th 212, 223-224; see also *People v. Perez* (2018) 19 Cal.App.5th 818, 830-831 [speculation of ineffective assistance is insufficient to carry a defendant's burden].) Despite his lack of recollection one way or the other, the contemporaneous evidence suggests Ghazarian did in fact advise Kalantaryan of the immigration consequences of his plea. In signing the *Tahl* waiver, Ghazarian represented to the court that he went over the form with his client, which included an advisement on "Immigration Consequences" stating, "I understand that if I am not a citizen of the United States, I must expect my plea of guilty or no contest will result in my deportation, exclusion from admission or reentry to the United States, and denial of naturalization and amnesty," and answered any questions his client had. Further, Kalantaryan affirmed in court that Ghazarian had done so.[7]

---

[7] Kalantaryan suggests his counsel had little reason to advise him of the immigration consequences of his plea because *Padilla v. Kentucky* (2010) 559 U.S. 356 [130 S.Ct. 1473, 176

17

Although Kalantaryan claimed he "did not read English very well" at the time of his 2010 plea, the record suggests that as early as the 2004 removal proceedings, he was comfortable in court using only English. Indeed, six years later during the 2010 plea hearing, he expressly represented that he was comfortable with English and in proceeding without an interpreter, and declined an interpreter after being told one would be provided upon request. Finally, the trial court orally advised Kalantaryan that his plea "will result" in his deportation, and Kalantaryan affirmed that he understood.

Kalantaryan argues that pursuant to *People v. Curiel, supra*, 92 Cal.App.5th 1160, a *Tahl* waiver and the court's colloquy do not *preclude* him from demonstrating that he did not meaningfully understand the immigration consequences of his plea. (*Curiel, supra*, at p. 1175.) True enough. But that still means Kalantaryan had to present credible evidence that he did

---

L.Ed.2d 284], which required such advice as a matter of federal law, had been issued "just mere months" before. However, his plea occurred six months after the Supreme Court issued *Padilla*. Moreover, as the Legislature acknowledged, California courts also had held several years prior to *Padilla* "that defense counsel must investigate and advise regarding the immigration consequences of the available dispositions, and should, when consistent with the goals of and informed consent of the defendant, and as consistent with professional standards, defend against adverse immigration consequences." (§ 1016.2, subd. (a), citing *People v. Bautista* (2004) 115 Cal.App.4th 229, *People v. Barocio* (1989) 216 Cal.App.3d 99, and *People v. Soriano* (1987) 194 Cal.App.3d 1470.) We "strongly presume[]" that counsel rendered adequate assistance and thus complied with these rules. (*Strickland v. Washington* (1984) 466 U.S. 668, 695 [104 S.Ct. 2052, 80 L.Ed.2d 674].)

not meaningfully understand the immigration consequences the court explained to him, which he failed to do. In contrast, in *Curiel* the plea counsel's testimony provided independent corroboration of the defendant's claim that counsel provided inadequate and incomplete immigration advice at odds with what the court told the defendant. (*Id*. at p. 1177.) Here, there is no such corroborating evidence.

Based upon our independent review of the record, we agree with the trial court that Kalantaryan's criminal and immigration history impugns his claim that he did not understand what was happening during the 2010 plea. He had been advised at least three times prior to 2010 that his pleas would have immigration consequences (at least twice with an Armenian interpreter), and indeed, even went through removal proceedings as a result of his earlier pleas. Contrary to Kalantaryan's claim that he "had no idea" his 2010 plea would subject him to removal, these experiences establish Kalantaryan's familiarity with the very real risk that he would be deported and discredit his apparent belief that he could continue to commit and then admit to serious felonies while remaining in the United States.

Kalantaryan argues that because he was not removed after his 2004 convictions, he "would have no reason to believe . . . that his conviction in [2010] had any more serious immigration consequences." We disagree. It is well within a layperson's understanding that he is not similarly situated vis-à-vis the immigration authorities when he accumulates more felony convictions, including one that resulted in a longer sentence of

three years in state prison.[8]  Even if the competing inference suggested by Kalantaryan is plausible, we give particular deference to the trial court's conclusion to the contrary after observing Kalantaryan testify.  (*People v. Vivar*, *supra*, 11 Cal.5th at p. 527.)

Because Kalantaryan has not demonstrated that he did not meaningfully understand the consequences of his 2010 plea, we need not consider the other issues raised by the parties, including prejudice or whether Kalantaryan's motion was timely.

## B.   The Trial Court Did Not Violate the RJA

### 1.   *General Legal Principles*

"Effective January 1, 2021, the [RJA], which is codified in a scheme of interrelated statutes . . . (§§ 745, 1473, subd. (f), 1473.7, subd. (a)(3)), states that '[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin.'  (§ 745, subd. (a).)"  (*Young v. Superior Court* (2022) 79 Cal.App.5th 138, 147.)  "[S]ection 745, subdivision (a) . . . sets forth four categories of conduct that, if proven by a preponderance of the evidence, establish a violation of the" RJA.  (*People v. Lawson* (2025) 108 Cal.App.5th 990, 998.)  Relevant here, a violation occurs if "[t]he

---

[8] Kalantaryan also argues the immigration judge in 2012 could not consider the 2004 assault charge because it predated his admission as a lawful permanent resident.  Whether this is correct is an issue for immigration authorities to determine, should they decide to entertain his BIA appeal.  We concern ourselves with Kalantaryan's subjective understanding, and his own statements belie that he would have contemplated this nuance at the time of his 2010 plea.

judge . . . exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin" or used, during trial, "racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful."  (§ 745, subd. (a)(1), (2).)

" 'The Legislature enacted the [RJA] with the express intent "to eliminate racial bias from California's criminal justice system" and "to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing." ' " (*Sanchez v. Superior Court* (2024) 106 Cal.App.5th 617, 628.)  Thus, courts have found an RJA violation when race, ethnicity, or national origin are invoked in a way that denigrates, disparages, or otherwise invokes a negative stereotype against a person on one or more of the protected bases.  (See *Bonds v. Superior Court* (2024) 99 Cal.App.5th 821, 830; *People v. Simmons* (2023) 96 Cal.App.5th 323, 335-336.)  However, there is no RJA violation where there is no bias or animus based on race or ethnicity.  (E.g., *People v. Singh* (2024) 103 Cal.App.5th 76, 119 [questioning of a Punjabi defendant about whether the killing at issue had been an " 'honor killing' " under Punjabi culture did not violate RJA because that questioning "was a valid investigative inquiry related to understanding [the] defendant's motive and state of mind" and "put the events leading up to the shooting in context based upon his culture"].)

2.    *Analysis*

Kalantaryan argues the trial court's occasional references to his counsel, Alan Fenster, as "Mr. Stern" were anti-Semitic. He further argues that in commenting to Fenster "that's where

21

your client gets it from" in response to a statement from Fenster the court was referring to the trait of dishonesty, which the court allegedly equated with counsel's Jewish heritage.

We question whether the RJA provides a means to advance such claims here because Kalantaryan did not raise these concerns before the trial court or any other trial court representative and, thus, may have forfeited them.[9] Additionally, Kalantaryan's claims do not appear to fit the statutory language in that the proceeding at issue did not involve the state trying to "seek or obtain a criminal conviction or [to] seek, obtain, or impose a sentence" (§ 745, subd. (a); see § 1473.7, subd. (a)(3)) but a collateral postjudgment hearing regarding immigration issues and did not involve any alleged bias or animus directed at the defendant himself (see § 745, subds (a), (h)). We need not resolve these questions, however, because even assuming arguendo that Kalantaryan's claims are cognizable under the RJA, they are meritless. (*People v. Lawson* (2025) 108 Cal.App.5th 990, 1001.)

During Kalantaryan's testimony, he repeatedly interrupted the attorneys and even the court during questioning despite admonitions from the court to stop. Toward the end of the hearing, Fenster himself interrupted the court, leading the court to say, "Hold on. See, that's where your client gets it from."

---

[9] See *People v. Singh*, *supra*, 103 Cal.App.5th at p. 114 ["where, as here, [the] defendant could have but failed to raise his [RJA] claim below, it is forfeited"]; *People v. Lashon* (2024) 98 Cal.App.5th 804, 812 ["review of a [§] 745 claim, like any other appellate claim, is subject to the general appellate rules of preservation and forfeiture of claims that could have been but were not made in the trial court"].

Fenster responded by apologizing. Kalantaryan fails to demonstrate that this statement to Fenster referred to dishonesty or any other ethnic stereotype. Rather, both Fenster and Kalantaryan at times expressed themselves out of turn, including interrupting the court. The court's comment to Fenster that that was where Kalantaryan "[got] it from" occurred immediately after Fenster made one such interruption. That Fenster responded "Sorry" to the court and stopped talking even before the court made the challenged comment corroborates the conclusion that the court's remark referred to the interruption.

At two points during the evidentiary hearing, the court called Fenster "Mr. Stern." The first was when the court was questioning Kalantaryan about his contacts with Fenster. Fenster corrected the court, and the court responded, "I'm sorry. I apologize. I mess up names and I mess up dates. No disrespect. Mr. Fenster." The court then repeated the error, and this time the prosecutor corrected the court. The court then said, " 'Mr. Fenster.' I'm going to call you Mr. Stern. I like Mr. Stern better. You look like Mr. Stern. So 'Mr. Fenster.' " Fenster responded, "That's my mother's maiden name, your honor." The court replied, "Is it really? Okay. So I'm partially there." Later, as the court was speaking to defense counsel, it hesitated when identifying Fenster; the prosecutor then stepped in to supply Fenster's name, and Fenster said "Call me 'Stern.' I don't care what you call me."

During the hearing, the trial court separately had difficulty remembering the name of Kalantaryan's immigration counsel, Elsa Martinez. Kalantaryan and his counsel referred to Martinez by her last name at least nine times during Kalantaryan's testimony. Then, during the court's questioning, it asked, "Elsa

. . . what's her last name?" The court was reminded it was "Martinez." The court then asked Kalantaryan three questions before it inquired, "So Elsa—what's her last name again?" and was reminded it was Martinez. Despite this, the court later referred to Martinez as "Elsa Gonzalez."

This record does not demonstrate bias or animus based on race, ethnicity, or national origin. After the court was made aware that it had called Fenster by the wrong name, it apologized and admitted it had difficulty with names and dates. Indeed, the court also could not remember Elsa Martinez's name. Mistakes happen and there are no indicia that suggest these mistakes evinced bias or animus.[10] Kalantaryan argues that the court's comments to Fenster that he "look[s] like Mr. Stern" and "like[d] Stern better" demonstrate the court was not mistaken but instead biased. Even if these comments were ill-advised attempts to make light of the court's error, Kalantaryan has not shown how these comments denigrated, disparaged, or otherwise invoked a negative stereotype. Given the context in which the court made these comments, they do not suggest racial or ethnic bias or animus against Fenster.

---

[10] We note such mistakes are not restricted to the trial court. The table of contents in Kalantaryan's opening appellate brief mistakenly says the court called Fenster "Stein" instead of Stern.

## DISPOSITION

The order denying the motion to vacate Kalantaryan's conviction is affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.